278 So.2d 915 (1973)
Ronald Wayne THOMAS, Individually and as the Administrator of his minor children,
v.
The LOUISIANA STATE BOARD OF HEALTH, Through its President, Dr. Andrew Hedmeg, and the City of New Orleans Health Department, Bureau of Vital Records, Through its President Dr. Doris Thompson.
No. 5390.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 1973.
Daniel A. McGovern, IV, New Orleans, for plaintiff-appellees.
James P. Screen, New Orleans, for defendant-appellant.
Blake Arata, City Atty., Robert Belknap, Asst. City Atty., for defendant-appellee.
Before STOULIG, SCHOTT and BAILES, JJ.
BAILES, Judge.
The relator by this proceeding, seeks a writ of mandamus against the Louisiana State Board of Health and City of New Orleans, Health Department, Bureau of Vital Records, to compel the two named respondents to change the race designation from Negro to white on the birth certificates of his wife, Mrs. Norma Gravolet Thomas, and his two children, Kelly Ann Thomas and Kerry Mickal Thomas. The *916 writ did issue and after trial the court a quo made the writ peremptory. From the judgment of the trial court only respondent, Louisiana State Board of Health, has appealed. We find no error in the judgment of the trial court and, accordingly, it is affirmed at appellant's cost.
This matter has been before this court previously on a motion to dismiss. See La.App., 271 So.2d 81 (1972).
The facts which gave rise to this litigation are that relator and his wife were married in New Orleans on April 11, 1958, and of this marriage the two above named children were born. The original birth certificate of Mrs. Thomas designated her race as white. The original birth certificate of the two children likewise designated their race as white. However, in December, 1965, respondents changed the race designation from white to Negro on all three of the referred to birth certificates. Although requested to remove the race designation Negro from the birth certificates, respondents have refused.
In their answer, the respondents admitted that the race was originally shown as white, as alleged by relator. It is appellant's position that according to the evidence and records in its office Mrs. Thomas is 5/32nds Negro blood and the children are each of 2.5/32nds Negro blood. Further, that in compliance with LSA-R.S. 42:267, Mrs. Thomas and her two children are properly classified as Negroes.
The respondent argues that the records in its office which are the exhibits filed in evidence in the trial court warrant the change made in the birth certificates of Mrs. Thomas and the two children.
It would serve no useful purpose to burden this opinion with a detailed recitation of the genealogical chart and the 77 exhibits consisting of succession records, suit records, various decennial census records, birth, baptismal, marriage and death records extending back for more than a hundred years and spanning six or more generations, all of which variously bear race designations of the persons named therein of Negro, mulatto, F.M.C., colored, F.W.C., and white.
The census records show that the census taker had a restricted race designation to use and the designation depended on what interpretation the enumerator placed on the race classification as it applied to the subject enumerated. For example, the census records of 1850 and 1860 had three classifications, viz., white, black, and mulatto; and for the years 1870 to 1880, there were five race classifications, viz: white, black, mulatto, Chinese and Indian.
Insofar as the census records indicate, there is no specification of the quantity of Negro blood in a person classified as a mulatto, nor have we any way of determining what field application was made of this race designation.
No provision was made for a definition of the terms or race designations in these various type records used by the respondents in their computation of fractional percentage of Negro blood in the persons named in said records. Therefore, there were no means available for computation of the mathematical percentage of Negro blood ascribed by respondents to the subjects identified in the records. Aside from the absence of definitions, we find from the testimony of Mrs. Mugnier, the respondent did not utilize predetermined guidelines in ascribing percentage of admixture of Negro blood to any race designation. She testified that there were no department guidelines to determine the exact meaning of words delineating race. To illustrate, Mrs. Mugnier testified as follows:
"Q. I'm talking about the word `mulatto' which I think is French. What is your source to give that percentage? If you say mulatto is one half and quadroon is one quarter, where do you derive this? What is your authority?

*917 "A. This is the consenus of opinion.
"Q. Where?
"A. General opinion.
"Q. At your office?
"A. And then, of course, the very term itself. Quadroon is a quarter.
"Q. Again what law says quadroon is a quarter?
"A. I don't know that there is a law on it.
"* * *
"Q. Before you said mulatto signified one half.
"A. Yes, that is the general understanding of it.
"Q. Do you make these determinations from any administrative procedure or rules within your department?
"A. Well, together with Mr. Ciccio (sic) and Mr. Screen we usually collaborate on those."
In essence, the respondents have arrived at a fractional quantity of Negro blood attributable to Mrs. Thomas of 5/32nd and the two children of 2.5/32nds by ascribing arbitrary fractional quantities of Negro blood to race appellations that have no legally fixed racial definitions.
LSA-R.S. 42:267 states:
"In signifying race, a person having one-thirty second or less of Negro blood shall not be deemed, described or designated by any public official in the state of Louisiana as `colored' a `mulatto,' a `black,' a `negro,' a `griffe,' an `Afro-American,' a `quadroon,' a `mestizo,' a `colored person' or a `person of color.'"
In absence of definitions accurately applied at the time race determinations or designations are made on records, there are no legal means by which a person's racial content can be computed where the records bear such descriptive names as mulatto, quadroon, colored, personne de couleur, F.M.C. or F.C.M. Without a legal definition to be applied to such terms, these terms mean various things to different people. Under such circumstances no accurate exact mathematical percentage can be computed to comply with the provisions of LSA-R.S. 42:267.
In the administration of LSA-R.S. 42:267, the respondent is not provided with any definitions of terms used therein nor with a guide in ascribing mathematical fractions of Negro or white blood to named race designations. Because of the provisions of LSA-R.S. 42:267 and the reasons stated infra, we must reject respondent's argument that the records as exhibits filed in evidence herein warrant its action in changing the birth certificate of Mrs. Thomas and the two children.
It is the relator's contention that the case of State ex rel. Schlumbrecht v. Louisiana State Board of Health, La.App., 231 So.2d 730 (1970) writs refused, 235 So.2d 97 (1970), is controlling and descriptive of the instant case, and that it was on the authority of the Schlumbrecht case that the trial court relied in making the writ of mandamus peremptory.
We reaffirm the holding of the Schlumbrecht case that the records of the Registrar of Vital Statistics can be changed only when there is "no room for doubt." We have set forth above the reasons for doubt herein. Also see State ex rel. Frank Plaia v. Louisiana State Board of Health, La.App., 275 So.2d 201 (1973).
The relator did plead the unconstitutionality of R.S. 42:267, (Act 46 of 1970), however, the trial court did not reach that plea in deciding in favor of relator. Therefore, inasmuch as the unconstitutionality of this statute was not passed on by the trial court, such is not before us.
For the foregoing reasons, the judgment appealed from is affirmed at appellant's cost.
Affirmed.